**Opinion issued May 21, 2019**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00017-CV

_____

## IN THE MATTER OF A.M.

On Appeal from the County Court at Law No. 1
Fort Bend County, Texas
Trial Court Case No. 12-CJV-017003

## O P I N I O N[1]

---

1       On December 28, 2018, a panel of this Court issued an order withdrawing its August 28 opinion and judgment and reinstating the appeal to be resubmitted at a later date. *See* TEX. R. APP. P. 19.1 (court of appeals holds plenary power over its judgment until 30 days after court overrules all timely filed motions for rehearing or en banc reconsideration); 19.2 ("In a civil case, the court of appeals retains plenary power to vacate or modify its judgment during the periods prescribed in 19.1 . . . ."). The case was resubmitted on January 29, 2019 to a new panel.

A police investigation determined that A.M. was involved in a retaliatory gang shooting that resulted in the death of a rival gang's leader. Legal proceedings were initiated in juvenile court because A.M. was sixteen years old at the time of the shooting and juvenile courts hold exclusive jurisdiction over minors. On the State's motion to certify A.M. as an adult to face criminal charges in district court, the juvenile court issued an order finding that the State met its burden under Family Code section 54.02(a) for waiver of jurisdiction and transfer to district court.

After A.M. was convicted, an appellate court vacated his conviction and remanded the matter to the juvenile court, having concluded that (1) although the State had argued that Section 54.02(a) was the correct standard for waiver and transfer, Section 54.02(j) was the applicable standard because A.M. turned eighteen before the waiver and transfer hearing occurred and (2) the State had not presented any evidence directed to the Subsection (j) statutory requirements. *Morrison v. State*, 503 S.W.3d 724, 727–28 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (remanding for review of evidence in support of waiver and transfer under Section 54.02(j)).

On remand, the juvenile court heard evidence from law-enforcement witnesses and others. The juvenile court ruled that the State met its burden under

Subsection (j),[2] and the court waived its jurisdiction to allow transfer for criminal proceedings against A.M. as an adult.

In a single issue, A.M. argues that the trial court abused its discretion in waiving its jurisdiction because the State "failed to prove by a preponderance of the evidence that it was beyond the control of the State to proceed to certification before [A.M.'s] 18th birthday." A.M. seeks a reversal of the trial court's waiver order and dismissal of the case against him for lack of jurisdiction.

A.M. is now an adult and all parties agree that the Family Code statutory scheme that was in place at the time the State petitioned for certification applies to our review.[3] Under that scheme, A.M. can no longer be adjudicated in juvenile court. The disposition of this appeal can take only one of two forms. If we were to

---

[2] *See* TEX. FAM. CODE § 54.02(j)(4)(A) (permitting waiver of jurisdiction and transfer if, among other things, "the juvenile court finds from a preponderance of the evidence that . . . for a reason beyond the control of the state it was not practicable to proceed in juvenile court before the 18th birthday of the person" subject to transfer); *see also Moore v. State*, 446 S.W.3d 47, 51–52 (Tex. App.—Houston [1st Dist.] 2014) (holding that "the State" within Section 54.02(j) encompasses more than just prosecutors and includes members of law enforcement involved in case investigation and prosecution), *aff'd*, 532 S.W.3d 400 (Tex. Crim. App. 2017).

[3] No party argues that Section 51.0412 of the Family Code, which became effective on September 1, 2013—before the December 2017 transfer hearing on remand—applies. *See* TEX. FAM. CODE § 51.0412, Acts 2013, 83rd Leg., ch. 1299 (H.B. 2862), § 7, eff. Sept. 1, 2013 (permitting juvenile court to retain jurisdiction over person if, among other things, person is respondent in adjudication proceeding and proceeding is not complete before respondent turns eighteen, so long as court enters finding that prosecuting attorney exercised due diligence in attempt to complete proceeding before respondent became eighteen years of age).

determine that the trial court did not abuse its discretion in waiving jurisdiction, we would affirm the trial court's order and A.M. would be retried as an adult for the murder. If, on the other hand, we were to conclude that the trial court abused its discretion in waiving jurisdiction, our only option would be to reverse and render a judgment of dismissal.

Because the trial court abused its discretion in concluding that the State met its burden under Section 54.02(j)(4)(A), we reverse the trial court's order and render a judgment of dismissal.

## Waiver of Exclusive Jurisdiction and Transfer for Criminal Prosecution

A.M. contends that the juvenile court abused its discretion in waiving its exclusive jurisdiction and transferring his proceeding to criminal district court for prosecution as an adult. Specifically, A.M. argues that the State failed to meet its burden, under Section 54.02(j)(4)(A) of the Family Code, to establish "by a preponderance of the evidence that it was beyond the control of the state to proceed to certification before [A.M.]'s 18th birthday."[4] Before turning to the lengthy factual background of this case, we first set forth the statutory criteria for discretionary waiver and transfer that must guide the evidentiary review.

---

[4] Subsection (j)(4) contains alternative grounds for waiver and transfer that all parties agree are not relevant to this appeal. *See* TEX. FAM. CODE § 54.02(j)(4)(B).

4

**A.  Law on waiver of exclusive jurisdiction over minors and standard of review on appeal**

"Children ordinarily are not subject to criminal proceedings like adults." *In re S.G.R.*, 496 S.W.3d 235, 238 (Tex. App.—Houston [1st Dist.] 2016, no pet.). When a child engages in conduct that would be considered criminal if committed by an adult, it is called "delinquent conduct." *See* TEX. FAM. CODE § 51.03(a)(1). Murder, when committed by a minor, constitutes delinquent conduct. *See id.*; *see also* TEX. PENAL CODE § 19.02.

Juvenile courts have exclusive original jurisdiction over cases involving delinquent conduct by children between ten and seventeen years old. TEX. FAM. CODE §§ 51.02(2)(A), 51.04(a). Delinquency proceedings against minors proceed in juvenile court under the Juvenile Justice Code. *See id.* §§ 51.01–61.107. A juvenile court may waive its exclusive original jurisdiction under certain conditions and allow transfer of the proceeding to a district court for criminal prosecution. *Id.* § 54.02(a), (j). "Generally, the transfer of a juvenile offender from a juvenile court to a criminal district court for prosecution as an adult should be regarded as the exception, not the rule." *In re J.W.W.*, 507 S.W.3d 408, 414 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (citing *Moon v. State*, 451 S.W.3d 28, 36 (Tex. Crim. App. 2014)).

In a juvenile transfer proceeding, the State must produce evidence that persuades the juvenile court, by a preponderance of the evidence, that waiver of its

exclusive original jurisdiction is appropriate. *Moon*, 451 S.W.3d at 40–41, 45. What the State must prove to obtain transfer depends on whether the minor has reached the age of eighteen by the date of the transfer hearing. "Section 54.02(a) applies where the juvenile is less than eighteen years of age at the time of the transfer hearing," while "Section 54.02(j) applies where the juvenile is eighteen years old at the time of the transfer hearing." *In re D.L.C.*, No. 06-16-00058-CV, 2017 WL 1055680, at *4 (Tex. App.—Texarkana Mar. 21, 2017, no pet.) (mem. op.); *see Morrison*, 503 S.W.3d at 727–28.

A.M. was sixteen years old when the rival gang leader was shot and killed. He was seventeen years old when he was arrested and the State filed its motion for waiver and transfer. But he was eighteen years old when the juvenile court held the transfer hearing and later issued its ruling.

Once A.M. turned eighteen, the juvenile court's jurisdiction was limited to either dismissing the case or transferring the case to criminal district court.[5] *Moore*

---

[5] Effective September 1, 2013, a legislative exception to this rule of limited jurisdiction became available. *See* TEX. FAM. CODE § 51.0412, Acts 2013, 83rd Leg., ch. 1299 (H.B. 2862), § 7, eff. Sept. 1, 2013. Under this exception, a juvenile court may retain jurisdiction over a person, without regard to the person's age, if, among other things, the person is a respondent in an adjudication proceeding and the proceeding is not complete before the respondent turns eighteen, so long as the court enters a finding in the proceeding that the prosecuting attorney exercised due diligence in attempting to complete the proceeding before the respondent's eighteenth birthday. *See In re B.R.H.*, 426 S.W.3d 163, 166 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *In re V.A.*, 140 S.W.3d 858, 859–60 (Tex. App.—Fort Worth 2004, no pet.). As stated, neither party argues that the transfer hearing in this case is subject to the Section 51.0412 legislative exception.

*v. State*, 532 S.W.3d 400, 404–05 (Tex. Crim. App. 2017); *In re N.J.A.*, 997 S.W.2d 554, 555–56 (Tex. 1999). If the State did not meet its burden under Section 54.02(j), the juvenile court's only option was to dismiss the case against A.M. *Morrison*, 503 S.W.3d at 727–28; *see Moore*, 532 S.W.3d at 405; *N.J.A.*, 997 S.W.2d at 557.

The only subpart of Section 54.02(j) that was at issue on remand and now on appeal is whether the State met its burden, under Section 54.02(j)(4)(A) to establish "from a preponderance of the evidence that . . . for a reason beyond the control of the state it was not practicable to proceed in juvenile court before the 18th birthday of the person . . . ." TEX. FAM. CODE § 54.02(j)(4)(A); *see Morrison*, 503 S.W.3d at 727–28. Subsection (j)(4)(A) "is meant to limit the prosecution of an adult for an act he committed as a juvenile if his case could reasonably have been dealt with when he was still a juvenile." *Moore*, 532 S.W.3d at 405 (concluding that State's "failure to get around to this case in time did not meet [its] burden" under Section 54.02(j)(4)(A)).

In reviewing a discretionary transfer, we evaluate the trial court's findings of fact under traditional sufficiency-of-the-evidence principles. *In re J.G.*, 495 S.W.3d 354, 369 (Tex. App.—Houston [1st Dist.] 2016, pet. denied) (citing *Moon*, 451 S.W.3d at 47). Under a legal-sufficiency challenge, we credit evidence favorable to the challenged finding and disregard contrary evidence unless a reasonable factfinder could not reject the evidence. *Id.* at 369–70 (citing *Moon v. State*, 410

7

S.W.3d 366, 371 (Tex. App.—Houston [1st Dist.] 2013), *aff'd*, 451 S.W.3d 28 (Tex. Crim. App. 2014)). If there is more than a scintilla of evidence to support the finding, the no-evidence challenge fails. *Id.* at 370. Under a factual-sufficiency challenge, we consider all the evidence presented to determine if the court's finding is so against the great weight and preponderance of the evidence as to be clearly wrong or unjust. *Id.* (citing *Moon*, 410 S.W.3d at 371).

If the findings of the juvenile court are supported by legally and factually sufficient proof, then we review the ultimate waiver decision under an abuse-of-discretion standard. *Moon*, 451 S.W.3d at 47; *In re H.Y.*, 512 S.W.3d 467, 478–79 (Tex. App.—Houston [1st Dist.] 2016, pet. denied). As with any decision that lies within the trial court's discretion, the question is not whether we might have decided the issue differently. *Moon*, 451 S.W.3d at 49. Instead, we ask whether the juvenile court's transfer decision was "essentially arbitrary, given the evidence upon which it was based, or [whether] it represent[ed] a reasonably principled application of the legislative criteria." *In re J.G.*, 495 S.W.3d at 370 (quoting *Moon*, 451 S.W.3d at 47). "A trial court has no 'discretion' in determining what the law is or applying the law to the facts. Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion." *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

With that standard in mind, on remand four years later, the State presented evidence to satisfy its burden to establish by a preponderance of the evidence that, due to a reason back then that was beyond its control, it was "not practicable to proceed" in juvenile court before A.M.'s eighteenth birthday. *See* TEX. FAM. CODE § 54.02(j)(4)(A); *Morrison*, 503 S.W.3d at 727–28.

**B.    Testimony regarding law enforcement's initial view of the case**

The original lead investigator assigned to this gang murder was Lieutenant R. Terry of the Missouri City Police Department. The matter was later assigned to Sergeant R. Ramirez, a member of the Sugar Land Police Department who was also the supervisor of a tri-city Special Crimes Unit that had recently been formed to support gang-related and other specialized criminal investigations in Sugar Land, Stafford, and Missouri City. Both officers testified.

Lieutenant Terry received a report of a homicide in Missouri City the evening of August 26, 2010. Terry went to the home of Kristian Sullivan, who had been shot multiple times and killed in his front yard. Sullivan was a known leader of a high-school-affiliated gang known as FAB. At the scene, Terry found spent shell casings that were all the same caliber but were two different brands or manufacturers. This meant there was either one shooter who used mismatched ammunition or two shooters—at this point it was unclear. Terry's initial view of the case, formed while

9

at the crime scene that evening, was that it was likely a gang-related shooting involving either one or two shooters.

During their testimony, both Terry and Ramirez discussed the inherent difficulties in investigating gang crimes: gang members generally are reluctant to implicate fellow gang members; when they do, their statements are often self-serving and not credible; when a gang member provides a lead, the name given is often a street name or gang name that the officers have trouble linking to a particular individual; and, finally, even when the officers suspect that the person who committed the crime has a particular gang affiliation, the officers still have a relatively large list of possible suspects because some local gangs have hundreds of members. These gang-specific concerns were expected to make the case development more difficult.

**C.** **Testimony detailing the criminal investigation between August 2010 and October 2011**

*August 2010 to November 2010: Beginning of criminal investigation*

While Terry was at the murder scene, one of Sullivan's friends, Curtis Taylor, suggested to Terry that Rickel Baker might have been the shooter. Baker was a member of a rival gang known as 100 Clikk. Before Terry completed his on-site investigation, he received a call that Baker had been shot at his house in a drive-by shooting. Terry suspected the shooting was retaliatory. According to Terry, the

shootings appeared to be part of the on-going gang violence between FAB and 100 Clikk.

Two days later, another 100 Clikk gang member, Darius Pye, was arrested in Pearland and claimed to have information related to Sullivan's murder. Terry met with Pye, who alleged that another person known as "Black Mike" had been involved in the murder. Terry determined that "Black Mike" was a 100 Clikk gang member named Michael Wilbourn and met with him on September 1, 2010, less than one week after the murder. Wilbourn denied involvement.

Over the next month, the police pursued leads and excluded a couple people as suspects.

In October 2010, Wilbourn reached out to police to provide additional information. At the time, Wilbourn was in a federal detention facility on charges of aggravated robbery. The FBI assisted in arranging the interview, which occurred in December 2010.

### *December 2010: First allegation that A.M. is connected to murder weapon*

During his interview, Wilbourn told Terry that a person referred to as "Tony T" had tried to sell Wilbourn the gun "that was used to kill ole boy." Terry understood at the time that Wilbourn was referring to Sullivan's death. Terry testified that he did not find Wilbourn's statement to be credible, but he intended to follow up on the lead.

11

By the next day, Terry had figured out that "Tony T" was A.M.'s 100 Clikk gang name. Terry went to a house that had been linked to A.M., intending to interview him, but the house was vacant. Terry left a business card on the door. A week later, Terry learned that A.M. had recently been released from a juvenile detention center and, as a condition of his release, A.M. was required to wear an ankle device that would monitor his location. Terry did not ask the juvenile probation department to give him the address linked to the ankle monitor. When asked why he did not ask for the linked address to go interview A.M., Terry responded, "Because I didn't." Terry did not otherwise attempt to interview A.M.

Terry summarized the investigation status as of December 2010 as follows:

> I really don't have a suspect identified at this time because I have multiple individuals who are providing with street names who we've identified some, but we don't have anything to corroborate what each of those individuals said or to provide that each individual may be involved in this homicide. . . . You really can't move forward without tangible evidence that you can link a person or a named person to the crime or to the criminal offense.

There were no additional direct leads for several months.

### June 2011: New leads focus on another 100 Clikk gang member, Sterlyn Edwards, with no mention of A.M.

In June 2011, the murder investigation was assigned to the Special Crimes Unit led by Sergeant R. Ramirez. The Special Crimes Unit was focused on maintaining frequent, direct contact with gang members in a tri-city area that included Sugar Land, Stafford, and Missouri City. These targeted contacts were

12

known as "gang sweeps." During weekly gang sweeps, the Special Crimes Unit officers would find and document gang members and, during the interactions, ask the gang members for information about Sullivan's murder.

Both Terry and Ramirez described the gang members as uncooperative. When the gang members provided possible leads, they appeared to be self-serving statements that the officers were unable to corroborate. Ramirez described it as "kind of just names that were bouncing around" without corroboration.

Once Ramirez took over the investigation, he sought to re-interview Pye and Wilbourn. Both 100 Clikk members provided additional information during their second interviews. Pye was interviewed in June 2011. He indicated that fellow 100 Clikk gang member, Sterlyn Edwards, had been involved in Sullivan's murder. Pye told Ramirez that he had overheard Edwards threaten to shoot a FAB gang member like he shot the FAB leader, Sullivan. According to Ramirez, "this was the first actual break in the case" because "one gang member . . . was implicating someone else within his gang."

Over the next few months, four additional people—100 Clikk and FAB members—further implicated Edwards.

### October 2011: Edwards implicates A.M., and two non-gang members connect A.M. to Sullivan's shooting

In October 2011, Sergeant Ramirez interviewed Edwards. Edwards said that he had become friends with rival gang member Sullivan. One day, Edwards called

Sullivan to set up a meeting at which two fellow 100 Clikk gang members—A.M. and Joshua Patterson—would buy marijuana from Sullivan. According to Edwards, the only purpose of the visit was to buy marijuana. Edwards told Ramirez that he, A.M., and Patterson drove to Sullivan's house in a borrowed car, A.M. and Patterson got out of the car, and he stayed in the car. During the interview, Edwards minimized his role and, according to Ramirez, "placed all the responsibility" on A.M. and Patterson.

Edwards also told Ramirez about two young women who could provide additional information. Ramirez interviewed the women and determined that they had loaned their Taurus to the 100 Clikk gang members that night. The two stated that they were with Edwards, Patterson, and A.M. at A.M.'s house. Edwards, Patterson, and A.M. were "plotting something" using "gang code" that the women did not understand. When they prepared to go out, one of the women decided not to go because she did not want to be involved; the other agreed to go along. The woman who went out with the gang members told Ramirez that they left A.M.'s house in the Taurus with Patterson driving, they drove to Sullivan's house, A.M. and Edwards got out of the car, she heard gun shots, A.M. and Edwards returned to the car, Edwards recounted how Sullivan looked when he shot him, and A.M. was comparatively quiet. After they dropped A.M. at his house, she saw Patterson hide a gun in the hood of the Taurus.

That same month, a non-gang member, R. Moreno, told Ramirez that he was A.M.'s best friend and that he had been shot while hanging out at a 100 Clikk house a year earlier. Ramirez found that information significant because it provided a possible motive for Sullivan's shooting in that gang violence is often retaliatory.

At that point—October 2011—based on his investigation, and particularly based on the information he received from Edwards and the two young women, Ramirez considered both Edwards and A.M. to be suspects in Sullivan's murder.

**D.    Law on holding a person criminally responsible for another's acts, Sergeant Ramirez's testimony on timing of meeting the probable-cause threshold to arrest A.M., and additional testimony on seeking and obtaining corroborating evidence before arresting A.M.**

**1.    Law of parties: criminal responsibility for person who is not the primary actor**

The Penal Code authorizes criminal responsibility for a person who is a "party to an offense" if the offense "is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." TEX. PENAL CODE § 7.01(a). "A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." *Id.* § 7.02(a)(2).

When a party is charged for an offense in which he was not the "primary actor," the State must prove, first, the conduct constituting the offense, and, second,

15

an act by the defendant done with the intent to promote or assist the criminal conduct. *Beier v. State*, 687 S.W.2d 2, 3 (Tex. Crim. App. 1985). The law of parties establishes a party's responsibility for the conduct of another based on the party's "level of participation in the offense, even if he was not the proverbial triggerman." *McIntosh v. State*, 52 S.W.3d 196, 200–01 (Tex. Crim. App. 2001).

Evidence is sufficient to sustain a conviction under the law of parties if it shows that the defendant was physically present at the offense and encouraged the commission of the offense either by words or other agreement. *Cordova v. State*, 698 S.W.2d 107, 111 (Tex. Crim. App. 1985). An agreement among parties to act together in common design is seldom proven by words. Often, the State must rely on the actions of the parties, shown through direct or circumstantial evidence, to establish the understanding or common design to commit the criminal offense. *Marable v. State*, 85 S.W.3d 287, 293 (Tex. Crim. App. 2002); *In re J.S.*, No. 03-17-00344-CV, 2018 WL 4100785, at *2 (Tex. App.—Austin Aug. 29, 2018, no pet.) (mem. op.); *Miller v. State*, 83 S.W.3d 308, 314 (Tex. App.—Austin 2002, pet. ref'd). Any agreement must have been made before or contemporaneous with the criminal event, but in determining whether one has participated in an offense, the court may examine the events occurring before, during, and after the commission of the offense. *Miller*, 83 S.W.3d at 314.

"Mere presence at the scene of a crime does not implicate an individual as a party. However, participation in a criminal offense may be inferred from the circumstances." *In re J.S.*, 2018 WL 4100785, at *2 (citing *Beardsley v. State*, 738 S.W.2d 681, 684 (Tex. Crim. App. 1987)).

There are numerous cases analyzing criminal liability for gang-related and other drive-by shootings. In one gang-related drive-by shooting case, an appellate court held that there was legally sufficient evidence to affirm a murder conviction tried under a law-of-parties theory on evidence that a man was gunned down outside his home, two cars drove past his house with occupants shooting at the man, one bullet killed the man, and the defendant drove one of the two cars. *Leal v. State*, No. 13-04-00287-CR, 2005 WL 2476260 (Tex. App.—Corpus Christi Oct. 6, 2005, no pet.) (mem. op., not designated for publication). The defendant's conviction under a law-of-parties theory did not require evidence that the defendant fired the bullet that killed the man, that he fired a gun at all, or even that he drove the particular car from which the fatal shot was fired. *See id.* at *3 ("We believe appellant's actions in driving a vehicle used in the drive-by shooting aided or attempted to aid the person who murdered Medina, even if that person was not in appellant's vehicle. From this circumstantial evidence, the jury could have concluded that appellant intended to promote or assist the commission of Medina's murder."); *see Anguiano v. State*, No. 05-92-01065-CR, 1993 WL 438181 (Tex. App.—Dallas Oct. 26, 1993, no pet.)

17

(mem. op., not designated for publication) (appellate court affirmed murder conviction under law-of-parties theory in gang-related drive-by shooting in which defendant knew of plan to fight, drove vehicle to fight location, shot his gun "into the air," drove from scene, and helped dispose of weapons, holding that "evidence is sufficient to establish that [the defendant] was aware that his actions were reasonably certain to aid in causing the shooting death" of individual killed); *Esparza v. State*, No. 14-95-01257-CR, 1998 WL 724364 (Tex. App.—Houston [14th Dist.] Oct. 8, 1998, no pet.) (not designated for publication) (appellate court affirmed murder conviction under law-of-parties theory on evidence that defendant and person killed were in rival gangs, they had history of gang altercations, defendant was driver of vehicle used in drive-by shooting and leaned out of his vehicle holding gun, concluding that factfinder reasonably could have determined that defendant had requisite intent to aid passenger-shooter in act of shooting person who was killed even though there was no evidence that defendant fired his gun).

> ## 2. Sergeant Ramirez's testimony that the police had probable cause to arrest A.M. by mid-October 2011 under a law-of-parties theory of criminal responsibility

Sergeant Ramirez was specifically asked whether he was familiar with the law of parties and whether he believed in mid-October 2011—based on the information he had after interviewing Edwards and the two young women—that A.M. could be held criminally responsible for Sullivan's murder as a party to the offense. Ramirez

18

replied, "Absolutely, yes." He was asked the same question about Patterson and again replied, "Absolutely."

Ramirez was asked why, then, he did not request an arrest warrant for Edwards, Patterson, or A.M. in mid-October 2011. He responded, "We weren't there yet. There's one other person we needed to talk to." Ramirez explained that he was referring to Patterson. He later added that he also wanted to talk to A.M.

### 3. Sergeant Ramirez's testimony on further criminal investigation after probable-cause threshold had been met for A.M.

Ramirez interviewed Patterson in late-October 2011. During the interview, Patterson admitted that he drove the Taurus to Sullivan's house. Patterson told Ramirez that Edwards and A.M. got out of the car just before Patterson heard the gunshots. Patterson said that, later that night, Edwards gave him a gun to conceal in the hood of the Taurus.

Ramirez testified that he requested an arrest warrant for Patterson the same day he interviewed him in late-October 2011. Ramirez's explained that his primary focus, at that time, was on securing Patterson's immediate arrest because he was the only of the three 100 Clikk gang members in the Taurus that night who was not already in custody somewhere for some offense. Ramirez was concerned about the safety of the two young women who had provided information in the criminal investigation. A.M. and Edwards were already confined and posed no threat to the women's safety. Patterson, though, was still free.

While Ramirez testified that he was focused only on securing Patterson's arrest, he also testified that he requested A.M.'s arrest at the same time as Patterson's. It is undisputed that Ramirez presented information on October 31, 2011 to obtain an arrest warrant for Patterson, Edwards, and A.M. Consistent with requesting an arrest warrant for these three gang members, Ramirez testified that he believed he had probable cause to arrest Patterson, Edwards, and A.M. on October 31, 2011.

Despite having requested A.M.'s arrest, Ramirez testified that his intention, at that time, was to wait for physical evidence to corroborate a two-shooter theory before moving forward against A.M. He testified, "I think I was ready to move forward with the warrant like on Tony T," referring to A.M.'s gang name, but he also noted that he "didn't have any physical evidence . . . as to his involvement" or to "corroborate he was there." Ramirez explained that he still "wanted some more" evidence—physical evidence.

At that point, when Ramirez moved forward with the arrest of Patterson based on probable cause but did not move forward with the arrest of A.M. despite probable cause, A.M. was seventeen years and 7 months old. He was only five months from his eighteenth birthday. Ramirez was asked about his decision to wait to pursue A.M.'s arrest, given that A.M. was almost eighteen years old. Ramirez explained that it was never conveyed to him that A.M. was about to turn eighteen or that his

20

age created any prosecutorial deadlines. Ramirez stated that he was not aware of any reason for urgency in the case against A.M.

The police investigation continued. In December 2011, Ramirez re-interviewed Wilbourn, who told Ramirez about an earlier conversation he had had with A.M. and Edwards. The two had given Wilbourn a ride because Wilbourn's car had broken down. They picked Wilbourn up in a borrowed Taurus. During the car ride, Edwards told Wilbourn that he had been involved in Sullivan's shooting, A.M. attempted to sell Wilbourn a gun, and Edwards and A.M. told Wilbourn that the Taurus was the same car they had used to "do the murder." A.M. was not arrested on this new information.

### 4. Sergeant Ramirez's testimony about waiting to obtain physical evidence before arresting A.M.

Ramirez waited to arrest A.M. until after he received confirmation from a firearms lab, in January 2012, that two weapons were used in the Sullivan murder.[6] When it was pointed out to him that he did not likewise wait for the lab report to arrest Patterson, Ramirez agreed that both men already were subject to prosecution even if the firearms analysis failed to provide incriminating physical evidence.

---

[6] The circumstances around the issuance of the firearms lab's finding is discussed below.

Probable cause was established in mid-October 2011. Ramirez explained why he, nonetheless, waited on the lab report before arresting A.M.:

> Yeah, I think what—it's been a while but I think what I wanted is when I got to the point where I could interview [A.M.], like I could have physical evidence to bring to that interview. It's better to have that information with you so that way if a suspect starts lying to you, that you can pull something out and say, no, actually I do have proof that this happened. That would be one reason that I was waiting on physical evidence.

Ramirez's explanation fails to take into account A.M.'s impending birthday.

### 5. Firearms examiner's testimony about findings and issuance of lab report

One of the witnesses at the Section 54.02(j) transfer hearing was J. Turner, the firearms examiner at the Harris County Institute of Forensic Sciences. She explained the timeline for testing the casings, reaching the conclusion that two weapons were used in Sullivan's murder, and conveying that information to investigators:

| Year | Date | Event |
|------|------|-------|
| 2010 | | |
| | Sept. 9 | First portion of the items were received for analysis |
| | Oct. 12 | Additional items received from medical examiner |
| 2011 | | |
| | June 10 | Items removed from the lab so that DNA testing could be performed before the firearms analysis |
| | Oct. 27 | Items returned to lab and placed back in line for analysis |
| | | "Somebody" requested that the analysis be "given some priority," but Turner does not know who made the request |
| | Nov. 3 | Turner began analysis |
| | Nov. 4 | Turner completed analysis |
| | Nov. 17 | Technical review completed |
| 2012 | | |
| | Jan. 27 | Administrative review completed |
| | May 30 | Written lab report forwarded to law enforcement |

Thus, according to Turner, the process lasted more than one and one-half years.

Turner explained that the form used to request an analysis from the lab did not have a section to mark the work request as a priority or rush assignment. Turner stated that the lab nonetheless was willing to accommodate rush requests and that such requests were "not an uncommon thing." Rush requests typically were made by phone or email. In 2011, the lab did not use a tracking method to memorialize

phoned requests to expedite. If anyone called to request a rush in this case, there would be no record of it.

Ramirez testified about requests for expedited lab analyses as well. He stated that the Harris County Ballistics Firearms Lab is not a part of his police department and that the lab assists police departments from surrounding areas as a "favor":

> Harris County isn't part of Fort Bend County. . . And they're basically doing us a favor by conducting the firearms examination; and though Fort Bend, we don't have a lot of murders involving guns, Harris County, they do. So, I know that they're backlogged. I know that it does take a while to get firearms labs back.

But Ramirez also testified that he knew he was able to request a rush and had done so in earlier cases. He did not request a rush in this case because he was unaware there was any need for a rush: "I didn't see the rush in this case . . ."

Turner completed her examination on November 4, 2011 and concluded that two weapons had been used to shoot Sullivan. But her written report could not be immediately released because the lab's procedures required a mandatory, internal review. The first step of the mandatory review was a "technical review" of the physical evidence to confirm Turner's conclusions. The lab completed the technical review on November 17, 2011. Under the labs procedures, lab results normally would not be released after the technical review; instead, the release followed the completion of an administrative review. However, according to Turner, she would

have been permitted to verbally release her findings to law enforcement after the technical review if she had received a request to do so. No such request was made.

Turner's draft written report was forwarded for the "administrative review" on November 17, 2011. The purpose of that review is to analyze the report for completeness and grammatical errors. The lab completed the administrative review more than two months later, on January 27, 2012. The lab results were forwarded to law enforcement the same month.

According to Turner, the lab would have permitted release of its conclusions to law enforcement once the technical review was completed in November 2011, even though the administrative review had not been done. Turner testified that she "wouldn't say that it's a known fact" that the lab was willing to release findings early. She further testified that "it's not done that often."

On the topic of early release of findings, Sergeant Ramirez testified that he did not know findings could be released early or that they would have been released in mid-November 2011 if he had requested that they be.

**6. Sergeant Ramirez's testimony about receiving lab results and arresting A.M.**

Ramirez testified that he received a call on January 26, 2012 letting him know that the firearms lab had confirmed that two guns were used in the murder of Sullivan. According to Ramirez, this provided the physical-evidence corroboration he was seeking. He explained, "[T]hat was the first date that I finally had something

physical—some physical evidence. I knew two people got out of the car. Now I know two separate guns were used."

The same day he received the lab results confirming that there had been two shooters, Ramirez filed new documents to obtain A.M.'s arrest.[7] But these new documents did not include the newly received information from the firearms lab. Instead, Ramirez relied on the same information he had included in the affidavit to support Patterson's arrest in late-October 2011.

Three days later, on January 29, 2012, officers removed A.M. from a juvenile detention center where he was being held on unrelated charges and transported him to a juvenile holding center in Fort Bend County. At that point, A.M. was seventeen years and ten months old, and the juvenile court would lose jurisdiction in two months.

### 7. Summary of Sergeant Ramirez's testimony on timing of establishing probable cause to arrest A.M. and subsequent events

Ramirez testified that probable cause existed to arrest A.M. in mid-October 2011 following the interviews of Edwards and the two young women. He testified that probable cause still existed in late-October 2011, after he interviewed Patterson.

---

[7] Because A.M. was a minor at the time of the offense, the arrest warrant was referred to as a "directive to apprehend." *See* TEX. FAM. CODE § 52.015(a) ("On the request of a law-enforcement or probation officer, a juvenile court may issue a directive to apprehend a child if the court finds there is probable cause to take the child into custody under the provisions of this title."). There is no meaningful distinction between an arrest warrant and a directive to apprehend in the witnesses' testimony.

Relatedly, Ramirez requested A.M.'s arrest on October 31, 2011, when he also requested Patterson's arrest. Yet he arrested Patterson and not A.M.

Ramirez confirmed that he was aware that criminal defendants could be prosecuted as a party to the offense. And he thought, in October 2011, that A.M. could be prosecuted under a law-of-parties theory.

Instead of pursuing A.M.'s arrest at either of these junctures, Ramirez preferred to wait for physical evidence that would support direct liability against A.M. as a triggerman. Ramirez was unaware of any rush in the case that would counsel against waiting on physical evidence in a murder case against a minor offender who was approaching his eighteenth birthday. In the end, Ramirez agreed that he had probable cause to arrest A.M. in mid-October 2011 and would have still had probable cause if the lab results did not further implicate Ramirez as a triggerman.

E.    **Evidence of prosecutorial activity between the date of A.M.'s arrest and the date of the first waiver and transfer hearing**

On February 13, 2012—about two weeks after A.M. was arrested—the State filed its petition for a discretionary transfer to criminal district court under Section 54.02(a) of the Family Code. This is the provision that applies to transfers of minor-offenders who are still minors on the date of the transfer hearing. TEX. FAM. CODE § 54.02(a). Section 54.02(d) establishes certain required steps for transfer under Section 54.02(a), including that "the juvenile court shall order and obtain a complete

27

diagnostic study, social evaluation, and full investigation of the child, his circumstances, and the circumstances of the alleged offense" before the hearing on the transfer motion. *Id.* § 54.02(d). To comply with Section 54.02(d), the juvenile court appointed Dr. K. Gollaher to evaluate A.M. But the Fort Bend County Juvenile Probation Department did not send the information she needed for her evaluation until one month later. The State did not call Dr. Gollaher to testify or present any evidence explaining why a month passed between her appointment and the necessary information being provided to her.

On March 26—four days before A.M.'s eighteenth birthday—the State requested and the juvenile court signed an order transferring A.M. from Fort Bend County Juvenile Detention to Fort Bend County Jail, where adults are housed.

On March 27, the Probation Department's Psychology Division forwarded to Dr. Gollaher the information she needed to conduct her psychological evaluation.

On March 30, A.M. turned eighteen.

On April 5, Dr. Gollaher performed her psychological evaluation of A.M. She completed her report later that month, and the juvenile court released the report to all parties.

On June 8, A.M.'s juvenile probation officer completed her social home study report, which could not be completed before receipt of Dr. Gollaher's psychological evaluation.

28

On June 12, the juvenile court held a hearing on the State's petition to transfer. The prosecutor described the hearing as "a traditional discretionary transfer hearing" filed under Section 54.02(a). The prosecutor noted that A.M. had turned eighteen on March 30 but that the State had filed its petition for discretionary transfer while A.M. was still seventeen years old. The prosecutor argued that transfer was governed by Section 54.02(a), not Section 54.02(j), because the petition to transfer was already on file when A.M. turned eighteen. According to the prosecutor, because the petition was filed "well before" A.M.'s eighteenth birthday, Section 54.02(j) was "never triggered." Accordingly, the State did not put on any evidence in support of transfer under Section 54.02(j).

On June 13, 2012, the juvenile court granted the State's petition, waived its jurisdiction, and transferred the case to the criminal district court. The transfer and subsequent conviction were reversed on appeal, which led to the hearing and testimony discussed above in the State's efforts to meet the requirements of transfer under Section 54.02(j). *See Morrison*, 503 S.W.3d at 728.

**F.    The juvenile court's findings following the second waiver and transfer hearing on remand analyzed under Section 54.02(j)**

The juvenile court held the second waiver and transfer hearing, on remand, in December 2017. As discussed, Lieutenant Terry, Sergeant Ramirez, and firearms examiner J. Turner testified, among others. Following the hearing, the trial court made 50 factual findings that laid out the chronology of events during the two-year

29

criminal investigation. These findings note when the police interviewed various gang members, when the lab took certain actions, when Dr. Gollaher received and released information, and when filings were made in support of transfer.

The trial court did not make any specific findings on witness credibility. Nor did the trial court make any findings about whether a particular event could or could not have occurred at a given time. Instead, the first 50 findings are strictly a chronological recitation.

The trial court then made five additional findings "in favor of discretionary transfer" under Section 54.02(j), the first of which stated:

> [A.M.] is 18 years or older. On the date of the initial discretionary transfer hearing [A.M.] was eighteen (18) years of age, having been born on March 30, 1994. On the date of the remanded discretionary transfer hearing [A.M.] was twenty-three (23) years of age. For reasons beyond the control of the state, it was not practicable to proceed in juvenile court before the eighteenth (18th) birthday of [A.M.]

The fourth additional finding stated:

> The juvenile court finds from a PREPONDERANCE OF THE EVIDENCE that pursuant to Texas Family Code section 54.02(j) for reasons beyond the control of the state it was not practicable to proceed in juvenile court before the eighteenth (18th) birthday of [A.M.], based on the previous factual findings of this Court.

The other three findings dealt with A.M.'s age and probable cause in general terms.

Nowhere in these findings did the juvenile court make a factual determination that identified a condition or event as a Section 54.02(j) "reason beyond the control

30

of the state" or that linked any identified "reason" to a sense of not being practicable to proceed.

**G.    The trial court abused its discretion in waiving its exclusive jurisdiction and granting transfer of A.M. to criminal district court for prosecution as an adult**

The trial court's factual findings set forth a timeline of events during the development of the murder case against A.M. The State's witnesses discussed the progression of the case as these events unfolded. The State's witnesses identified at least three periods of time in which, according to the State's own witnesses, the case was ready to proceed to the next stage but did not.

The first period was the three months between October 2011 and January 2012. Ramirez testified that he understood the law-of-parties theory permitted criminal charges against those who aid or assist in a crime. In October 2011, Ramirez thought the requirements of probable cause were met for Patterson and A.M., under a theory of law of parties, because of their involvement in driving to Sullivan's house and killing him with multiple gunshots. Ramirez even filed papers requesting A.M.'s arrest in October 2011. But the State did not pursue the arrest. The State—whether at the behest of Ramirez or the prosecutors—preferred to wait for physical evidence, which would support a theory of direct liability for actually shooting a gun at Sullivan.

Even if the State had been in the position to wait for evidence that would support a theory of direct liability, there was a second three-month period identified by the State's own witnesses in which the case was ready to proceed but did not. The lab technician's report was disclosable on November 17, 2011. The State's witnesses all testified that they did not realize there was any reason to rush the lab review process or the case generally, and so they never called or otherwise asked for an expedited release of the lab's results. The lab's results were available for release on November 17, 2011, but the State was satisfied to wait until their release through routine procedures three months later in late-January 2012.

The third period identified by the State's own witnesses was in connection with Dr. Gollaher's required evaluation. The timeline established by the State's witnesses, and accepted by the trial court in its findings of fact, shows that the juvenile court ordered a psychological evaluation of A.M. on February 22, 2012—just over one month before A.M.'s eighteenth birthday—but the information Dr. Gollaher needed to conduct her evaluation was not provided by the Fort Bend County Juvenile Probation Department until March 27—which was more than one month later and only three days before A.M.'s birthday. Dr. Gollaher completed her report about one month after receiving the information from the probation department, even though there was no evidence she was asked to expedite the report.

Testimony provided by the State's witnesses identified these three periods: two three-month periods and one one-month period.[8] No witness identified any "reason" the case did not move forward during these seven months. They did the opposite. Without exception, the State's witnesses testified that there were no impediments: probable cause existed in October 2011, yet A.M. was not arrested; the lab results were ready November 17, 2011, yet no one requested expedited release much less expedited analysis; and Dr. Gollaher demonstrated that she could produce a report in about one month, yet no one sent her the needed materials for more than a month.

Ramirez did offer that the State waited to proceed with arresting A.M. because Ramirez "wanted more" evidence against him, even though Ramirez understood that the State already met the threshold of probable cause. Ramirez's testimony provides some explanation why the State waited. But it does not provide what is required: a reason beyond the control of the State that influenced the available progression of the case. Ramirez conceded that he was aware there was probable cause to move forward in the case on the allegation of murder in October 2011 under the law of

---

[8]     There is arguably a fourth period of delay between December 2010 and October 2011. In December 2010, Wilbourn told Terry that A.M. had tried to sell him the gun used to kill Sullivan, yet no officer pursued A.M.'s interview despite knowing A.M. was wearing an ankle monitor. In October 2011, those interviewed by law enforcement again signaled A.M.'s involvement, and the investigative focus returned to A.M.

parties. The "more" that Ramirez wanted could have been used in an interrogation to establish A.M. was being untruthful, but there is no suggestion in this record that the State needed "more" to shore up its investigative conclusion that A.M. was responsible for this crime.

Not only was there no "reason" identified in the State's evidence, the State also failed to establish through its evidence that any reason would qualify as "beyond the control of the State." TEX. FAM. CODE § 54.02(j)(4)(A). Not one witness testified that, for any of these three periods, there was an outside factor that influenced the progression of the case.

The juvenile court's factual findings in this case distinguish it from another waiver and transfer case, *In re B.C.B.*, No. 05-16-00207-CV, 2016 WL 3165595 (Tex. App.—Dallas June 7, 2016, pet. denied). There, a teenager disclosed to a neighbor on April 11 that she had been sexually assaulted two years earlier by a classmate who had since moved away. *Id.* at *5. The investigating police officer learned of the allegation the next day, on April 12, and thought it provided probable cause to arrest the accused. *Id.* The police officer waited to make an arrest until the following month, however, because the officer "did not have an official outcry from complainant," the accused's "location was unknown," "additional gathering of information could cause [the officer] to change his mind" about the accusation, and waiting would "protect the accused" from an unfounded allegation that had not yet

been investigated. *Id.* The appellate court held that the State met the requirement of Section 54.02(j) on that evidence. The probable cause threshold was reached the day after the complainant first disclosed the earlier assault, but, at that point, the police had not interviewed the complainant or otherwise investigated the alleged crime. Moreover, the arrest was only one month after the initial outcry.

The progression leading to a probable cause determination was very different here. The first witness to implicate A.M. was Wilbourn in December 2010. He told the officers that "Tony T" had tried to sell him a gun used to kill Sullivan. By the next day, the investigating officers understood that "Tony T" was A.M.'s gang name. A.M. was in the mix of potential suspects for almost a full year when, in mid-October 2011, Edwards and the two young women implicated him through their statements that were consistent with each other, with earlier statements by others, and with the physical evidence collected at the crime scene. Then, by late-October 2011, after Patterson was interviewed, law enforcement had four individuals placing A.M. at the scene of the shooting, another individual indicating A.M. was in possession of the murder weapon, and a statement that A.M. had discussed the murder in a way that implicated himself. Probable cause against A.M. was the result of a lengthy criminal investigation with ample corroboration. And the State's own witness stated that probable cause existed in October 2011—three months before the State pursued the arrest of A.M.

The State argues that its actions were within the bounds of appropriate case advancement. It argues that it should not be required to "drop everything and do everything perceivable and conceivable to avoid delay" or establish that it was wholly "prevented" from proceeding. We agree. Section 54.02(j) does not set such a high standard. Instead, it places a burden on the State to establish, by a preponderance of the evidence, given that the waiver and transfer hearing did not occur until after A.M.'s eighteenth birthday, that it was not practicable for it to have proceeded before his eighteenth birthday because of a reason beyond the State's control. *See* TEX. FAM. CODE § 54.02(j)(4)(A); *Moore*, 446 S.W.3d at 52. We do not locate any evidence in this record of a "reason" that was "beyond the control of the State" on which the State could rely. *Cf. Moore*, 446 S.W.3d at 52 (concluding that detective's heavy caseload and mistake as to defendant's age were not "reasons beyond the State's control" to satisfy Section 54.02(j) burden and vacating conviction). Simply put, failing to realize that a deadline existed is not outside the State's control.

Looking at the record in its entirety, the absence of supporting evidence is consistent with the State's position at the first waiver and transfer hearing: the State had been proceeding under a theory that the Subsection (j) requirements would not apply, meaning that the State would not be put to the burden of establishing a reason

it had not been practicable to proceed before A.M.'s eighteenth birthday, and the State simply "didn't see the rush in this case."[9]

A.M. contends that the State failed to carry its burden under Subsection (j) at the second waiver and transfer hearing and that the juvenile court abused its discretion in granting the motion on insufficient evidence. We must agree. The State did not present any evidence of a reason beyond its control that it linked to a practicability analysis. The State investigated this murder under the impression there was "no rush," found out only after A.M. turned eighteen that the heightened standard of Subsection (j) applied, and then looked to the record for a fortuitous reason beyond its control that influenced the case progression to meet the standard of being not practicable to proceed. The record simply does not provide such proof. Instead, it affirmatively establishes the opposite.

The dissent would permit the State to investigate a case at its own pace without regard to the statutory deadline of the juvenile's eighteenth birthday. The plain language of the relevant statute does not permit this approach. In the event that it is impracticable for the State, for reasons beyond its control,[10] to file a petition and

---

[9]     The State does not argue that there is a good-faith exception to adherence to Subsection (j)'s requirements in the event the State has failed to operate under the correct subsection. *Cf.* TEX. CODE CRIM. PROC. art. 38.23(b) (providing good-faith exception to exclusionary rule when law enforcement, acting in objective good faith, rely on warrant issued by neutral magistrate based on probable cause).

[10]    Failure to mitigate investigative or procedural delay is not something outside the State's control. *See, e.g.*, *Moore*, 532 S.W.3d at 404–05 (law enforcement's heavy

37

obtain a transfer ruling from the juvenile court before the child's eighteenth birthday, the State need only make a showing of the reason by a preponderance of the evidence. Statutory compliance with a deadline when probable cause was established months earlier is neither "heroic" nor extraordinary. It is, however, difficult where the State did not realize the deadline existed and must rationalize, post hoc, a failure to comply with it.

This case is only about whether the juvenile court had jurisdiction to authorize transfer pursuant to Texas Family Code section 54.02(j). The dissent's sojourn into the merits of the juvenile court's waiver of jurisdiction under Section 54.02(f) transcends the question before the Court. Accordingly, Section 54.02(f), *Moon v. State*, 451 S.W.3d 47–56, and *Matthews v. State*, 513 S.W.3d 45, 55–56 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd), have no relevance to the jurisdictional inquiry. For that reason, discussion of the Subsection (f) factors, such as the record and previous history of the child and the nature of the offense, distracts from the resolution of the narrow jurisdictional question presented.

---

case load was not beyond State's control); *Webb v. State*, No. 08-00-00161-CR, 2001 WL 1326894, at *6 (Tex. App.—El Paso Oct. 25, 2001, pet. ref'd) (not designated for publication) (failure to ask the court to expedite the transfer hearing, causing a six-week delay, was not outside State's control).

Because there was no evidence to support the trial court's ultimate determination that the requirements of Section 54.02(j)(4)(A) were met, we must reverse the trial court's order waiving jurisdiction and transferring to district court.

## H.      Mandatory disposition

Because the State did not meet its burden, its non-compliance with Section 54.02 deprived the juvenile court of jurisdiction. We therefore hold that the juvenile court lacked jurisdiction to transfer the case to a criminal district court and, as a result, the criminal district court may not acquire jurisdiction. *Moore*, 446 at 52. The trial court abused its discretion. We proceed with the only available disposition: dismissal of the case for lack of jurisdiction.

## Conclusion

We reverse and dismiss the case for lack of jurisdiction.


Sarah Beth Landau
Justice

Panel consists of Justices Keyes, Higley, and Landau.

Justice Keyes, dissenting.