**Opinion issued November 7, 2023**



In The

# Court of Appeals

### For The

# First District of Texas

_____

### NO. 01-23-00358-CV

_____

## IN THE MATTER OF J.J.T., A Juvenile

---

### On Appeal from the 313th District Court
### Harris County, Texas
### Trial Court Case No. 2022-02190J

---

## MEMORANDUM OPINION

J.J.T. ("Jacob")[1] was charged by petition with having engaged in delinquent conduct by causing the death of the complainant by shooting him with a deadly weapon while committing and attempting to commit robbery. The petition alleged that Jacob was between the ages of 10 and 17 when he engaged in the delinquent

---

[1] We use a pseudonym to refer to the child. *See* TEX. R. APP. P. 9.8(c)(2).

conduct. On the State's motion, the juvenile court waived its jurisdiction and transferred the case to criminal district court. On appeal, Jacob argues that the juvenile court abused its discretion by waiving its jurisdiction because the evidence was insufficient to satisfy the statutory bases for transfer. *See* TEX. FAM. CODE § 54.02(j)(4)(A), (B)(i) (permitting discretionary transfer when juvenile court finds by preponderance of evidence that (A) State could not proceed in juvenile court before person's 18th birthday for reasons beyond its control, or, (B) despite due diligence, State lacked probable cause before person turned 18 and found new evidence after person turned 18).

We reverse.

## Background

Jacob was born on January 15, 2004. The alleged offense, capital murder, occurred on October 4, 2020, when Jacob was 16 years and 8 months old. Jacob was arrested in December 2022, around 11 months after he turned 18.

The State moved the juvenile court to waive jurisdiction and transfer the proceedings to criminal district court. The juvenile court held an evidentiary hearing at which Harris County Sheriff's Deputy D. Crain testified that he investigated an apparent homicide after a man was found dead in the driver's seat of a pickup truck with a cell phone in his hand. The decedent, M. Gutierrez, had suffered multiple gunshot wounds to the head. Crime scene investigators photographed the scene,

processed the vehicle for latent fingerprints, collected multiple DNA samples, and took custody of Gutierrez's cell phone.

Deputy Crain notified Gutierrez's family members of his death. The family told Deputy Crain that Gutierrez was "in the marijuana business" and was likely in that location to sell marijuana. Gutierrez's sister provided investigators with the passcode to his cell phone. Deputy Crain read the text messages that Gutierrez received and sent prior to his death. These messages included turn-by-turn instructions to the location where Gutierrez was found from a contact listed as "Maybe Alfonso." Deputy Crain researched the phone number using a law enforcement database and learned that the number associated with "Maybe Alfonso" belonged to Alfonso Hernandez Tovar.

Deputy Crain found no witnesses to the murder. He and other deputies obtained video recordings from nearby houses. The investigators learned that Tovar had lived near where Gutierrez was found. Two investigators approached the house next to Tovar's last known address, which was Jacob's house, to ask about video recording from the night of the incident from their street-facing camera. The record does not indicate whether the investigators obtained a recording from that camera, but Jacob's brother provided a video clip of Jacob and Tovar from the night before. Jacob's brother also told investigators that Jacob and Tovar were best friends.

Deputy Crain testified that, based on the recordings they obtained, they believed that three people had fled the scene after the murder.

Around mid-October 2020, investigators spoke with Jacob with his mother present. He was then 16 years old. At first, Jacob denied any knowledge of the shooting, but he later stated that Tovar had been involved in a marijuana deal that "had gone bad" and someone was killed. Jacob denied any involvement in the shooting, but he told investigators that "word on the street" was that he was involved. Jacob told them that he believed Tovar was involved and would have more information.

On November 12, 2020, the sheriff's office obtained a warrant for Tovar's arrest based on information found in Gutierrez's phone that connected Tovar to the shooting. Tovar's phone had communicated details of the deal and directions to the scene. And investigators determined that a latent fingerprint from the pickup truck was Tovar's fingerprint.

Tovar had his cell phone when he was arrested. The phone was passcode protected. Deputy Crain testified that he obtained a search warrant to access Tovar's phone and conduct a forensic examination. The cell phone was submitted to the "high-tech crime unit" to be placed on "the GrayKey, which is specialized equipment that is used to defeat the pass codes on the phone." Deputy Crain testified that the GrayKey continuously attempts to unlock the phone by going through "all

4

the sequences of numbers" to determine the passcode. Deputy Crain said that the GrayKey process "can take many months up to years" to unlock a phone.

Deputy Crain attended Tovar's custodial interview. At first, Tovar denied he was involved, but he later admitted that he was present when Gutierrez was murdered. Tovar first said that he was with Jacob in Texas City when two other people killed Gutierrez. When confronted with inconsistencies in his answers, Tovar admitted that he was present at the time of the murder. Deputy Crain recalled Tovar saying that he was with Jacob and a third man, named Renaldo or Rolo, and that Jacob used a revolver to shoot Gutierrez over a marijuana deal. Tovar said that they ran away after the shooting, and that Jacob had the gun and the marijuana at that time.

Deputy Crain testified that he did not believe he had probable cause to charge Jacob with capital murder based on Tovar's interview. He said: "[A]t that point in time, all I had was the, basically, uncorroborated statement of a co-defendant that had kind of been all over the map and eventually gave us a pretty self-serving statement. So the only information I had implicating [Jacob] at that time was [Tovar's] statement."

Deputy Crain detailed the next steps in his investigation:

Well, after [Tovar] was placed in jail, the investigations continued in seeking a DNA lab report, firearms report and those types of things. Then I also—frankly, I get caught in other cases. I mean, our call volume is quite high. And, so, while I'm still—this case is on the desk

5

for certain, with work to be done, there are other cases also coming in that require attention.

About a year after Tovar's custodial interview, in November 2021, an assistant district attorney contacted Deputy Crain to inform him that Tovar wanted to have a proffer meeting. In early December 2021, two other deputies attended the proffer meeting, where Tovar revealed the passcode for his cell phone. According to Deputy Crain, "at that time [Tovar's cell phone] was still being processed on the GrayKey," which had not unlocked Tovar's passcode. After the proffer meeting, the investigators opened Tovar's phone, and they confirmed Jacob's cell phone number at the time of the murder. Tovar also told investigators at the proffer meeting that he and Jacob had traveled together to Texas City on the day of the murder. Tovar told them that while returning home, he and Jacob devised a plan to rob Gutierrez of his marijuana that night. At the time of the proffer meeting, Jacob was about one month shy of his 18th birthday.

Deputy Crain testified that he did not believe he had probable cause to charge Jacob with capital murder in December 2021:

> [T]he evidence that I had still was not any more than what I had before in terms of it was still an uncorroborated statement by a co-defendant that had not been bolstered by any other information; be it, cell phone records or DNA or latent prints or any other type of evidence. Nothing else had been really established at that time.

On January 15, 2022, about 40 days after the proffer meeting, Jacob turned 18 years old.

In July 2022, about seven months after the proffer meeting, Deputy Crain obtained a search warrant for the call-detail records of Jacob's phone to confirm the movements that Tovar described in his proffer meeting. By then, Jacob was 18 years old. Deputy Crain said that it took a week or ten days to receive to receive the call-detail records from the cell phone provider. He then gave the call-detail records to the crime analysis intelligence division of the Harris County Sheriff's Office to conduct "GeoTime" plotting, an analysis that compared Jacob's phone records with those of Gutierrez and Tovar.[2]

The GeoTime plotting analysis showed that Jacob and Tovar traveled together to Texas City on October 4, 2020, and that they returned together to Jacob's home. The analysis also showed that Jacob's and Tovar's phones traveled together away from that area after the murder. Deputy Crain testified that this analysis confirmed that Jacob was with Tovar at the time of the murder and confirmed statements Tovar made at the proffer meeting.

---

[2]     Deputy Crain explained how GeoTime works:

> The GeoTime program takes the latitude and longitude hits or points from each phone and it plots them in a moving time to where you can see if a phone is in communication with the same tower or if they have moved apart. And, so, in this case earlier in the day of October 4th, [Jacob] and [Tovar's] phones traveled together to Texas City and traveled back to the area of his home at the time of the murder; and then they both traveled away after the murder. It just gives us the location of what tower they're hitting on.

Deputy Crain sought to charge Jacob with capital murder based on the analyses combined with evidence obtained earlier in the investigation, which included Tovar's statements, evidence from Gutierrez's cell phone, and the latent fingerprint on Gutierrez's truck. At the transfer hearing, Deputy Crain testified that the district attorney disagreed at that time. He said: "They'd only give me a probable cause warrant. Because they still did not feel that we had sufficient evidence to charge [Jacob], but they gave me a pocket warrant. So, we arrested him pursuant to that warrant. That's what led to my second interview with him."

A warrant was issued November 8, 2022, and Jacob was arrested on December 6, 2022, and taken to the police station for questioning. Jacob was about 18 years and 11 months old. Deputy Crain gave Jacob statutory warnings, and Jacob agreed to give a recorded statement. Deputy Crain testified that Jacob at first denied any involvement in the murder. Deputy Crain said that when he challenged Jacob with additional evidence, Jacob "actually changed his story and admitted to being there and admitted what his role was supposed to be."[3] Jacob told Deputy Crain that he

---

[3] Deputy Crain testified about Jacob's intended role:

> Well, he was supposed to just grab the marijuana and run. And he says that he took the marijuana, smelled it, gave it to Tovar . . . . and then he witnessed [Tovar] inexplicably shoot the victim with a handgun that they had retrieved from a friend's house just prior to meeting him. . . . And that after shooting him, they began to run. And after ten steps or so in front of the vehicle, he observed [Tovar] pull the pistol out a second time and shoot through the windshield of the car before the three of them then ran off to another friend's house.

knew that they were bringing a gun to meet Gutierrez and that he saw Tovar shoot Gutierrez more than once. Deputy Crain said that Jacob also admitted taking the marijuana and handing it to Tovar.

Deputy Crain believed there was enough evidence to charge Jacob with capital murder based on Tovar's statement at the proffer meeting, the cell phone data that showed Tovar and Jacob had traveled together, and Jacob's admission during his custodial interview. Deputy Crain testified that some of Jacob's statements were false, and when he confronted Jacob with the cell phone data records, Jacob changed his story, ultimately admitting involvement in Gutierrez's murder.

Deputy Crain noted that some details Jacob offered did not match the results of his investigation, specifically Jacob's statement that Tovar used a "9-milli[m]eter" to shoot Gutierrez. Deputy Crain explained that a 9-millimeter is a semiautomatic handgun that leaves spent shell casings. Investigators recovered a 9-millimeter spent shell casing, but it was "at considerable distance" from the murder scene. Deputy Crain believed it "was the product of someone just driving by, randomly shooting a gun out of a car." Based on evidence recovered at the scene, Deputy Crain believed that the murder weapon was a revolver, which does not leave spent shell casings. Tovar had stated that Jacob committed the murder using a revolver, a fact that Deputy Crain said was "something that no one would have known absent them being there."

9

After Jacob's interview, Deputy Crain again contacted the district attorney's office and obtained authorization to charge Jacob with capital murder. Deputy Crain believed that Jacob was not a flight risk and did not pose any danger to anyone, so he allowed Jacob to leave with his father. Deputy Crain also wanted to confirm what procedures to use because Jacob was 16 years old when Gutierrez was murdered, but he was 18 years old when he admitted involvement with the murder. Deputy Crain charged Jacob on December 7, 2022, the day after Jacob's custodial interview. The next day, the State moved to waive jurisdiction and transfer the case to the criminal district court. On December 12, 2022, Deputy Crain arrested Jacob for capital murder.

Defense counsel cross-examined Deputy Crain about the length of the investigation and his caseload. Deputy Crain testified that he had a heavy caseload. He acknowledged that Jacob was "certainly on [his] radar" within the first month after the murder based on video recordings that showed three men fleeing the scene, Tovar's initial statement to police, Jacob's brother stating that Jacob and Tovar were best friends, and the video from Jacob's brother.

Deputy Crain did not reapproach Jacob to confront him with Tovar's accusation or any video. Interviewing juveniles, Deputy Crain testified, was "not something I'm real comfortable with. And, so, I try and avoid contacting juveniles as much as possible until we get to a point where we can get the order to apprehend

and get them in." There was no testimony that Deputy Crain tried to find the third man in the video.

Defense counsel asked about the status of the investigation between January and September 2021. Deputy Crain said that he communicated with Tovar's cell phone provider regarding call-detail records and that because of the merger of T-Mobile and Sprint, the data was inaccurate, so he served a second subpoena to obtain the records. He also conceded that from January to September 2021, he did not "have documentable activity related to this case" because of the pandemic and his heavy caseload.

Defense counsel also asked why seven months elapsed between the proffer meeting and Deputy Crain's application for a search warrant for Jacob's cell phone records. He declined to call the seven months a delay, saying: "Some things take a year and some things I can get to in a month." He acknowledged that this was due to his caseload.

The trial court asked Deputy Crain what led him to interview Jacob the second time, and he explained that after the proffer meeting, the district attorney's office did not believe there was enough evidence to charge Jacob and authorized only a pocket warrant to bring Jacob in for questioning. The court admitted and considered the certification report, along with photographs of Gutierrez, screen shots of text messages, and a cell phone showing a phone number. Jacob presented no evidence.

11

On May 1, 2023, the juvenile court waived its jurisdiction and transferred Jacob to the jurisdiction of the criminal district court. In its order to waive jurisdiction, the court made these findings:

1. [Jacob] is charged with a violation of a penal law of the grade of felony, namely CAPITAL MURDER an offense in the first degree committed on or about October 4, 2020.

2. There has been no adjudication of this offense.

3. That the Respondent is currently over the age of 18 years.

4. There is probable cause to believe that [Jacob] committed CAPITAL MURDER alleged in the petition filed under this cause number.

5. That the respondent was 14 years or older but under 17 years of age at the time he/she is alleged to have committed this offense being born on January 15, 2004.

6. The Court finds by a preponderance of the evidence that for a reason beyond the control of the State it was not practicable to proceed in juvenile court before the 18th birthday of the Respondent the State [sic] did not have probable cause to proceed in juvenile court and new evidence has been found since the 18th birthday of Respondent.

Jacob appealed.

## Analysis

On appeal, Jacob argues that the trial court abused its discretion when it found sufficient evidence and a sufficient legal basis to waive its jurisdiction.

## I.      Standard of review

Juvenile delinquency proceedings are civil proceedings that are quasi-criminal. *State v. C.J.F.*, 183 S.W.3d 841, 847 (Tex. App.—Houston [1st Dist.] 2005, pet. denied). Juvenile courts have exclusive original jurisdiction over allegations by the State that a child has engaged in delinquent conduct. TEX. FAM. CODE § 51.04(a); *see* TEX. FAM. CODE §§ 51.03(a)(1) (defining "delinquent conduct" to include "conduct, other than a traffic offense, that violates a penal law of this state"), 51.02(2)(A) (defining "child" to include person ten years old or older and under seventeen); *In re A.M.*, 577 S.W.3d 653, 657 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) ("When a child engages in conduct that would be considered criminal if committed by an adult, it is called 'delinquent conduct.'") (quoting TEX. FAM. CODE § 51.03(a)(1)). This jurisdiction, however, is not absolute. *Bell v. State*, 649 S.W.3d 867, 885 (Tex. App.—Houston [1st Dist.] 2022, pet. ref'd).

A juvenile court may waive its exclusive original jurisdiction and transfer a child to criminal district court to be tried as an adult. *See* TEX. FAM. CODE § 54.02(j). Generally, when a child in delinquency proceedings turns 18 years old, the juvenile court's jurisdiction is limited to either dismissing the case or transferring the child to criminal district court for criminal proceedings. *In re A.M.*, 577 S.W.3d at 658 & n.5; *but see* TEX. FAM. CODE § 51.0412 (authorizing juvenile court to retain jurisdiction over incomplete proceedings once child has turned 18 in limited

13

circumstances). The State bears the burden to produce evidence that persuades a juvenile court, by a preponderance of the evidence, that waiver of the court's jurisdiction and transfer to criminal district court is appropriate. *In re A.M.*, 577 S.W.3d at 658; *In re J.W.W.*, 507 S.W.3d 408, 415 (Tex. App.—Houston [1st Dist.] 2016, no pet.).

We use a two-step standard to review a juvenile court's order waiving its exclusive original jurisdiction and transferring a case to criminal district court. *Bell*, 649 S.W.3d at 887. First, we review the challenged findings under a traditional evidentiary sufficiency review. *Id.* In considering the legal sufficiency of evidence supporting a finding, we view the evidence in the light most favorable to the challenged finding and disregard contrary evidence unless a reasonable factfinder could not reject it. *Id.*; *In re A.M.*, 577 S.W.3d at 659. If more than a scintilla of evidence supports the finding, then the evidence is legally sufficient. *Bell*, 649 S.W.3d at 887; *In re A.M.*, 577 S.W.3d at 659. In conducting a factual sufficiency review, we consider all the evidence presented to determine whether the challenged finding conflicts with the great weight and preponderance of the evidence so as to be clearly wrong or unjust. *Bell*, 649 S.W.3d at 887; *In re A.M.*, 577 S.W.3d at 659.

When the juvenile court sits as factfinder, as here, the court alone determines the credibility of witnesses and the weight to give their testimony. *Bell*, 649 S.W.3d at 896; *In re A.B.*, No. 02-18-00274-CV, 2019 WL 983751, at *3 (Tex. App.—Fort

Worth Feb. 28, 2019, no pet.) (mem. op.). The factfinder may "believe or disbelieve a witness's testimony, in whole or in part, and [is] tasked with weighing the evidence and resolving any inconsistencies." *Bell*, 649 S.W.3d at 896; *accord Anderson v. Durant*, 550 S.W.3d 605, 616 (Tex. 2018) (stating that factfinder's role is to evaluate credibility of witnesses and reconcile any inconsistencies, and factfinder generally may "believe all or any part of the testimony of any witness and disregard all or any part of the testimony of any witness") (quoting *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 774–75 (Tex. 2003)).

If we conclude that the challenged findings are supported by legally and factually sufficient evidence, we proceed to the second step in our review: determining whether the juvenile court abused its discretion in ultimately waiving its jurisdiction and transferring the case. *Bell*, 649 S.W.3d at 887. A court abuses its discretion when it acts arbitrarily or without reference to any guiding rules and principles. *Id.* A juvenile court does not abuse its discretion just because it bases its decision on conflicting evidence. *Id.*; *see also In re A.M.*, 577 S.W.3d at 659 ("As with any decision that lies within the trial court's discretion, the question is not whether we might have decided the issue differently."). Rather, it abuses its discretion "when its decision to transfer is essentially arbitrary, given the evidence upon which it was based." *In re M.S.*, Nos. 01-21-00374-CV & 01-21-00375-CV, 2022 WL 17981563, at *4 (Tex. App.—Houston [1st Dist.] Dec. 29, 2022, no pet.)

(mem. op.) (quoting *In re C.M.M.*, 503 S.W.3d 692, 701 (Tex. App.—Houston [14th Dist.] 2016, pet. denied)). "By contrast, a waiver decision representing a reasonably principled application of the legislative criteria generally will pass muster under this standard of review." *Id.* (quoting *In re C.M.M.*, 503 S.W.3d at 701) (internal quotation omitted).

## II.    Governing law

Once a child in delinquency proceedings has turned 18, Family Code section 54.02(j) governs the juvenile court's waiver of its jurisdiction and transfer to criminal district court. *See Ex parte Thomas*, 623 S.W.3d 370, 377–78 (Tex. Crim. App. 2021); *In re A.M.*, 577 S.W.3d at 657–58. This section "is meant to limit the prosecution of an adult for an act he committed as a juvenile if his case could reasonably have been dealt with when he was still a juvenile." *Moore v. State*, 532 S.W.3d 400, 401 (Tex. Crim. App. 2017). Section 54.02(j) permits the juvenile court to waive its exclusive original jurisdiction and transfer the person to a criminal district court if:

(1)    the person is 18 years of age or older;

(2)    the person was:

(A) 10 years of age or older and under 17 years of age at the time the person is alleged to have committed a capital felony or an offense under Section 19.02, Penal Code;

. . . .

16

(3)    no adjudication concerning the alleged offense has been made or no adjudication hearing concerning the offense has been conducted;

(4)    the juvenile court finds from a preponderance of the evidence that:

    (A)    for a reason beyond the control of the state it was not practicable to proceed in juvenile court before the 18th birthday of the person; or

    (B)    after due diligence of the state it was not practicable to proceed in juvenile court before the 18th birthday of the person because:

        (i)    the state did not have probable cause to proceed in juvenile court and new evidence has been found since the 18th birthday of the person;

        (ii)    the person could not be found; or

        (iii)    a previous transfer order was reversed by an appellate court or set aside by a district court; and

(5)    the juvenile court determines that there is probable cause to believe that the child before the court committed the offense alleged.

TEX. FAM. CODE § 54.02(j).

## III.    The juvenile court abused its discretion by transferring Jacob's case to criminal district court.

### A.    The trial court's findings

For juvenile transfer proceedings, the statutory scheme requires "the juvenile court to state the reasons for the waiver set out in the statute." *Ex parte Thomas*, 623 S.W.3d 370, 379 (Tex. Crim. App. 2021). There are two potential waiver grounds at issue.

Jacob argues that the trial court "convoluted the legal analysis" of subsections 54.02(j)(4)(A) and (B). Subsection (A) requires the State to establish that the delay was attributable to "a reason beyond the control of the state," while subsection (B) requires the State to show "due diligence." Jacob also argues that because the trial court did not find that the State acted with due diligence, section 54.02(j)(4)(B) is not a valid reason to support transfer of jurisdiction. The State did not respond to Jacob's argument about the adequacy of the trial court's practicability findings.

The trial court's practicability finding appears to have spliced the beginning of subsection (A) ("for a reason beyond the control of the state") with the end of subsection (B)(i) ("the state did not have probable cause . . ."):

> The Court finds by a preponderance of the evidence that for a reason beyond the control of the State it was not practicable to proceed in juvenile court before the 18th birthday of the *Respondent the* State did not have probable cause to proceed in juvenile court and new evidence has been found since the 18th birthday of Respondent.

TEX. FAM. CODE § 54.02(j)(4) (emphasis added) What is missing from two complete practicability findings is a finding of due diligence. *See id.* § 54.02(j)(4)(B).

When findings of fact and conclusions of law are filed by the trial court, these findings "shall form the basis of the judgment upon all grounds of recovery and of defense embraced therein." TEX. R. CIV. P. 299. We cannot add to the trial court's findings by inserting words or assuming the trial court found that the State acted with due diligence. *See Nguyen v. Nguyen*, 355 S.W.3d 82, 93 (Tex. App.—Houston

18

[1st Dist.] 2011, pet. denied) (express findings by trial court on one ground do not permit presumption of other findings on separate ground). Thus, although the trial court included findings for (A), the omission of a due diligence finding constrains us from presuming that the trial court intended to include findings under (B). *See id.* We now consider whether the evidence was sufficient to support the trial court's finding that "for a reason beyond the control of the State it was not practicable to proceed in juvenile court" before Jacob's 18th birthday.

**B.     The evidence is legally insufficient to support the court's finding.**

On appeal, Jacob argues that the evidence is legally insufficient to support a conclusion that "for reasons beyond the State's control it was not practicable to proceed in the juvenile court" before he turned 18. Jacob argues that the State controlled evidence linking him to the murder at three discrete times: (1) after interviewing him and Tovar in fall 2020; (2) after arresting Tovar and obtaining his custodial statement incriminating Jacob in November 2020; and (3) after Tovar provided his cell phone passcode at the proffer meeting in December 2021. Jacob argues that the State had probable cause after Tovar implicated Jacob. He argues that the State then waited another seven months before obtaining a search warrant for information related to Tovar's proffer meeting statements.

Deputy Crain was the only witness to testify at the transfer hearing. The trial court had the authority to determine his credibility and whether to believe all, some,

19

or none of his testimony. *See Bell*, 649 S.W.3d at 896. Deputy Crain testified that he did not have probable cause after Tovar implicated Jacob in his custodial interview, so he wanted to gather more evidence.

Law enforcement has probable cause to believe that a child engaged in delinquent conduct if "sufficient facts and circumstances [exist] to warrant" a prudent person to believe the suspect committed the offense. *In re C.M.M.*, 503 S.W.3d at 702 (citing *In re D.L.N.*, 930 S.W.2d 253, 256 (Tex. App.—Houston [14th Dist.] 1996, no pet.)). Probable cause requires a practical, common-sense approach rather than the more technical standards of reasonable doubt or a preponderance of the evidence. *Id*.

As statements against interest, accomplice statements can provide probable cause.[4] *See Clement v. State*, 64 S.W.3d 588, 593 (Tex. App.—Texarkana 2001, pet. ref'd) (holding that information in law enforcement search-warrant affidavit attributed to accomplice provided probable cause to support search warrant); *Cornealius v. State*, 870 S.W.2d 169, 172 (Tex. App.—Houston [14th Dist.] 1994) (holding that warrantless arrest was supported by probable cause based partly on

---

[4] The evaluation of accomplice statements for purposes of probable cause is different than at trial, where the accomplice may have agreed to testify against someone in exchange for the possibility of a lesser charge or sentence. *See Holladay v. State*, 709 S.W.2d 194, 200 (Tex. Crim. App. 1986) (where state relies on an accomplice witness's testimony, it must be corroborated by independent evidence connecting the accused to the offense).

accomplice statement against penal interest) *aff'd*, 900 S.W.2d 731 (Tex. Crim. App. 1995); *Chavez v. State*, No. 01-07-00563-CR, 2008 WL 5263404, *2–3 (Tex. App.—Houston [1st Dist.] Dec. 18, 2008, no pet.) (mem. op., not designated for publication) (holding that accomplice statement against self-interest that implicated defendant supported warrantless arrest). Implicating Jacob was against Tovar's interest because he admitted he was present with Jacob during the shooting.

Our legal sufficiency standard of review requires us to view the evidence in the light most favorable to the challenged finding, disregarding contrary evidence unless a reasonable factfinder could not. *See Bell*, 649 S.W.3d at 887; *In re A.M.*, 577 S.W.3d at 659. But even crediting Deputy Crain's testimony in its entirety, the evidence does not support the court's finding that the case did not proceed in juvenile court before Jacob's 18th birthday "for a reason beyond the control of the state." Here, a reasonable factfinder could not have disregarded Deputy Crain's testimony about Tovar implicating Jacob in 2020. "'Want[ing] more' evidence" against a suspect is not a reason beyond the control of the state where probable cause exists to proceed. *In re A.M.*, 577 S.W.3d at 670. Even if it were, Deputy Crain testified that he did not return to Jacob to confront him with Tovar's statement because of his personal preference:

> Honestly, it's not something that I'm real comfortable with. And, so, I try and avoid contacting juveniles as much as possible until we get to a point where we can get the order to apprehend and get them in.

21

Not moving forward when probable cause existed to proceed in juvenile court based on preferences for more evidence or not to re-interview juveniles are not "reasons beyond the control of the state." *Id*. Deputy Crain had an accomplice's statement against interest and video that he chose not to use to confront Jacob. To the extent that the prosecutor declined to proceed without more evidence, that decision is not a reason beyond the state's control. *See id*. When analyzing whether a case could not proceed in juvenile court before the child's 18th birthday for reasons "beyond the control of the state," both law enforcement and the prosecution are the state. *Moore*, 532 S.W.3d at 404. Put differently, investigative delay and prosecutorial delay are both charged to the State's account. *See id*. Deputy Crain had probable cause and the means to confront Jacob with new evidence. There is legally insufficient evidence that the case did not proceed before Jacob's 18th birthday for reasons beyond the State's control.

We hold that the evidence is legally insufficient to support the trial court's practicability finding. *See Bell*, 649 S.W.3d at 887; *In re A.M.*, 577 S.W.3d at 659.[5]

---

[5] Because we hold that the evidence was legally insufficient to support the juvenile court's sole practicability finding, we need not reach whether the evidence was factually insufficient. *See* TEX. R. APP. P. 47.1 (appellate court's written opinion need not address issues unnecessary to disposition of appeal).

## C. The juvenile court abused its discretion.

Having concluded that the juvenile court's finding is not supported by legally sufficient evidence, we further hold that the court abused its discretion. *See Bell*, 649 S.W.3d at 887. Because the State did not carry its burden under section 54.02(j) at the transfer hearing, the court's decision to transfer jurisdiction over Jacob to criminal district court was not a reasonably principled application of the legislative criteria. *See In re M.S.*, 2022 WL 17981563, at *4.

Because there was insufficient evidence to support the trial court's ultimate determination that the requirements of section 54.02(j)(4)(A) were met, we must reverse the trial court's order waiving jurisdiction and transferring to district court.

## C. Mandatory disposition

Because the State did not meet its burden, its non-compliance with section 54.02 deprived the juvenile court of jurisdiction. We therefore hold that the juvenile court lacked jurisdiction to transfer the case to a criminal district court and, as a result, the criminal district court may not acquire jurisdiction. *Moore*, 446 S.W.3d at 52. The trial court abused its discretion. We must dismiss the case for lack of jurisdiction. *See In re A.M.*, 577 S.W.3d at 672.

**Conclusion**

We reverse and dismiss the case for lack of jurisdiction.


Sarah Beth Landau
Justice

Panel consists of Justices Kelly, Landau, and Farris.

Justice Farris, dissenting. Dissent to follow.