

# NUMBER 13-25-00385-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

## IN THE MATTER OF J.P.D.D.

## ON APPEAL FROM THE COUNTY COURT AT LAW NO. 5
## OF NUECES COUNTY, TEXAS

## DISSENTING MEMORANDUM OPINION

**Before Chief Justice Tijerina and Justices Cron and Fonseca**
**Dissenting Memorandum Opinion by Justice Cron**

The State had exactly twenty-one months between J.P.D.D.'s arrest and his eighteenth birthday to proceed in juvenile court. At the beginning of the waiver hearing, the State told the juvenile court that "the *majority* of the delay [in this case] was due to an 18-month period when we did not have the—the necessary forensic and DNA evidence to go forward with trial." (Emphasis added). This theme permeated the State's

presentation, with multiple witnesses testifying about the alleged delay caused by the Texas Department of Public Safety crime laboratories. Both Detective Maria Peña and prosecutor James Northcutt testified that there was nothing they could do to speed the process up because, despite their best efforts, they were at the mercy of the finite resources of the DPS crime laboratories. The State suggested that, even though DPS is admittedly a state agency, any delays caused by the agency's crime laboratories should not be charged against "the state" under § 54.02(j)(4)(A) because local law enforcement "is working directly with [the district attorney's] office," whereas "[t]he [DPS] lab is one step removed." *See Moore v. State*, 532 S.W.3d 400, 403–04 (Tex. Crim. App. 2017) (concluding that "the common understanding of the term 'the state' includes both law enforcement and the prosecution").[1]  The State emphasized the complexity of prosecuting a murder trial and argued that because it did not receive the DNA results until August 2024, it was simply not practicable for the State to proceed in juvenile court before J.P.D.D. turned eighteen on November 21, 2024.

The juvenile court accepted the State's argument. In announcing its decision, the court expressed its concern that "time and again" delays in processing forensic evidence

---

[1] I question the State's assertion that the DPS Crime Laboratory Division is not "the state" for purposes of § 54.02(j)(4)(A). By definition, "[t]he Department of Public Safety of the State of Texas is an agency of the state to enforce the laws protecting the public safety and provide for the prevention and detection of crime." TEX. GOV'T CODE § 411.002(a). This includes DPS's Crime Laboratory Division. *See id.* ("The department is composed of the Texas Rangers, the Homeland Security Division, the Texas Highway Patrol, the administrative division, and other divisions that the commission considers necessary."); TEX. DEP'T OF PUB. SAFETY, *Crime Laboratory Division Overview*, https://www.dps.texas.gov/section/crime-laboratory (last visited Dec. 30, 2025) ("The DPS crime laboratories provide expert forensic laboratory services including scientific analysis, management of statewide technical programs, assistance with scientific investigations, expert testimony, and other related forensic services for the state of Texas.").

However, as I explain in this dissenting memorandum opinion, the record does not support the State's argument that delays caused by DPS prevented the State from proceeding in juvenile court before J.P.D.D. turned eighteen. Therefore, I would save this legal question for another day.

had negatively impacted juvenile proceedings. The juvenile court further commented that the issue "needs to be addressed by the legislature[,] and these cases need to be put in front of everything else."

The State contends that it was not practicable to proceed without the DNA evidence. *See In re J.J.T.*, 711 S.W.3d 687, 698 (Tex. 2025) ("The State has considerable discretion in the manner and means of conducting its investigations."). However, the State's own evidence reflects an unexplained delay of fourteen months between the collection and submission of this "critical" evidence for forensic testing. The Corpus Christi Police Department's "Incident/Investigation Report" shows that CCPD collected the DNA evidence within days of the offense, which occurred on February 19, 2023, but failed to deliver it to the DPS crime laboratory in Corpus Christi until April 19, 2024. In other words, for fourteen months, this "linchpin" evidence just sat in CCPD's "Property Warehouse." That same evidence indicates that the laboratory submitted a "DNA Laboratory Report" to CCPD on July 16, 2024, less than ninety days after the evidence was submitted, and returned the evidence to CCPD on August 6, 2024. According to that report, forensic testing affirmatively linked J.P.D.D. to the firearm that fired the fatal shot. So, while the prosecution pointed the finger at the DPS crime laboratories for the State's inability to proceed, the evidence shows that, for unexplained reasons, CCPD failed to advance the investigation across the finish line for fourteen months.

The record shows that the juvenile court took great care to reach a well-reasoned decision in this case. Unfortunately, this crucial fact, buried in a 208-page exhibit, was never brought forward during the two hearings the juvenile court conducted on this matter,

and there is no indication from the record that the juvenile court was even aware of, much less weighed, this significant and unexplained investigative delay. Regardless, because the evidence is factually insufficient to support the juvenile court's finding that, for reasons beyond the State's control, it was not practicable to proceed in juvenile court before J.P.D.D. turned eighteen, I respectfully dissent.

## I.      The Investigation Advanced Quickly in the Beginning.

Because waivers of exclusive jurisdiction are "fact-intensive determinations," it is important to understand the timeline of CCPD's investigation. *See id.* According to the various reports of CCPD officers involved in the investigation, during the early morning hours of February 19, 2023, shots were fired "at a vehicle that had been driving recklessly through the neighborhood of Guadalupe St[reet]," ultimately resulting in the death of Erasmo Avila, a passenger in the vehicle. Two other occupants in the vehicle were uninjured.

A witness at the scene told police that "teenagers" who frequently "hung out" at a residence located at 2737 Guadalupe Street were responsible for the shooting. Officers discovered that one of the adult males staying at the residence was dating J.P.D.D.'s sister. Officers received consent to search the residence and discovered "numerous [.]45 caliber spent shell casings" inside a trash bag that had been placed in a closet. Officers also recovered three spent shell casings outside the residence, including one in a "grassy area in front of the residence" and one inside a nearby storm drain.

Two days later, as CCPD officers approached the same residence, J.P.D.D., A.P., and a third juvenile spotted the officers and "evaded on foot." Officers found the juveniles

4

hiding in the crawl space of a neighbor's home. In the same crawl space, police recovered "two [.]45 caliber handguns," a Ruger and a Glock, that had been secreted under a tarp. All three juveniles were taken into custody.[2]

That same day, a witness gave a statement to police. According to the witness, J.P.D.D. and A.P. confessed to the shooting. The juveniles reportedly told the witness that "they stood out on the street and shot at the vehicle as it passed by on the fourth time." They also told the witness that "they shot at the vehicle approximately ten times" and "picked up nine casings from the shooting."[3] Believing it already had enough evidence for probable cause, CCPD arrested both J.P.D.D. and A.P. for murder later that day.

Pursuant to a search warrant, CCPD collected DNA samples from the juveniles on the day they were taken into custody. The following day, on February 22, 2023, CCPD swabbed the recovered firearms, associated magazines, and spent shell casings for DNA testing. This included swabs of each firearm's trigger, guard, slide, and grips. Some items were also tested for latent prints, but no prints were detected. On February 26, 2023, the swabs "were retrieved from the Evidence Vault, packaged, and submitted to Property."

Finally, within a week of the offense, a CCPD firearm examiner completed testing on the recovered firearms and shell casings. Among other findings, the examiner determined that the spent shell casings recovered from inside 2737 Guadalupe Street

---

[2] It was determined later that day that the third juvenile was not involved in the shooting.

[3] Another witness came forward two days later. He told police that "two youngsters had guns[,] and the younger one did the shooting of the car." He also reported that "the two youngsters were bragging about it all night and the next morning."

were fired by the same Ruger recovered from the crawl space.

Simply put, this was not a case with a delayed outcry or a narrow window between the offense and J.P.D.D.'s eighteenth birthday. *See id.* at 697 ("The timing of the outcry or crime must be considered against the time remaining until the juvenile's eighteenth birthday."). As Northcutt would later testify, with the above evidence in hand, the prosecution believed in September 2023, thirteen months before J.P.D.D. turned eighteen, that regardless of which juvenile fired the fatal shot, the State could prove the offense of murder "beyond a reasonable doubt" based on the law of parties. *See* TEX. PENAL CODE §§ 7.01(a) ("A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both."), 7.02(a)(2) ("A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense . . . ."), 7.02(b) ("If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy."), 19.02(b)(3) ("A person commits felony murder if he commits or attempts to commit a felony other than manslaughter, and in the course of and in furtherance of the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual."). As Northcutt put it, "there was plenty of evidence"

6

that "both young men fired the shots" that struck Avila's vehicle. I agree with his assessment that the State could have proceeded under the law of parties in the early stages of the case. *See, e.g.*, *Garcia v. State*, 578 S.W.3d 106, 125–27 (Tex. App.— Beaumont 2019, pet. ref'd) (finding evidence legally sufficient to support murder conviction under the law of parties where evidence established that appellant and his co-defendant both fired into the victim's vehicle but "it was unknown which gun [appellant] had that night").

Nevertheless, the State determined that to make the strongest case possible, it needed to be able to tell the jury which juvenile fired the fatal shot. *See* TEX. FAM. CODE § 54.03(b)(6) (providing that, in adjudication hearings, a juvenile has the "right to trial by jury"). Although there were no latent prints on either firearm, the State was hopeful that this question could be answered through touch DNA analysis of the firearms, magazines, and casings. At various points in the subsequent waiver proceedings, the State described this DNA evidence as "critical," "essential," and the "linchpin" of its case against J.P.D.D. as the primary actor responsible for Avila's death.

Although the State certainly has discretion to pursue one theory of criminal liability over another, "the juvenile court is charged with examining whether the exercise of this discretion devolved into unreasonable delay." *In re J.J.T.*, 711 S.W.3d at 698. In my opinion, if the prosecution believed that it had "plenty of evidence" to adjudicate J.P.D.D. under the law of parties well before he turned eighteen, then wasn't it "practicable" or "feasible" under the circumstances for the State to proceed in juvenile court without the DNA evidence? *See id.* at 697 (quoting *Practicable*, BLACK'S LAW DICTIONARY (11th ed.

7

2019)). At a minimum, the juvenile court was required to scrutinize whether the State's pursuit of DNA evidence "devolved into unreasonable delay." *See id.* at 698.

## II. CCPD Waited Fourteen Months to Submit the DNA Evidence to DPS.

Despite the stated importance of this DNA evidence, CCPD's own report shows that, pursuant to a request by Detective Peña, a crime scene investigator removed the various swabs from CCPD's "Property Warehouse" and submitted them to "[DPS] Crime Laboratory – Corpus Christi" on April 19, 2024.[4] The DNA Laboratory Report issued by DPS on July 16, 2024, confirms that the agency received the evidence on April 19, 2024. The results from the lab report affirmatively linked J.P.D.D. to the Ruger and A.P. to the Glock.

There is no evidence in the record establishing that the fourteen-month delay between the collection and submission of this evidence for testing was for a reason "beyond the control of the State." TEX. FAM. CODE § 54.02(j)(4)(A). In fact, no witnesses testified about when the evidence was collected (February 2023), when the evidence was submitted (April 2024), or how long it took DPS to conduct the tests and deliver the results to CCPD (approximately ninety days). Instead, the State gave the false impression that, for reasons beyond its control, it was "waiting" on the DPS crime laboratories for "an 18-month period." Northcutt expressly testified that, "*all throughout*, we've been waiting for a number of reports and lab tests. Chiefly, the—the forensics, the DNA analysis on the guns and shell casings and those things." (Emphasis added). The State then asked Northcutt

---

[4] On the same day, CCPD submitted other physical evidence to the DPS Crime Laboratory in Austin for forensic testing. Although analysis of this evidence proved unfruitful for the State, CCPD received the results and evidence on July 25, 2024.

8

if there was anything he could have done to "speed up the procedure of getting these tests," and he responded, "No. We worked pretty hard to try to get them done, but they're only so fast—only so quickly that they move." Similarly, when asked for her opinion on "what caused that delay in getting the evidence," Detective Peña responded, "I requested our forensics ID techs to send off the evidence and it was in the process of the State."

On the contrary, the record establishes that the DNA evidence could have been submitted for testing any time after it was collected in February 2023—Detective Peña simply needed to make the request. Her failure to do so until April 2024 needlessly condensed the State's timeline to proceed by fourteen months. So, while the prosecution may have been "waiting" on the test results for eighteen months, fourteen of those months are attributable to the State because of CCPD's investigative delay. *See In re J.J.T.*, 711 S.W.3d at 698; *Moore*, 532 S.W3d at 403.

At least one court has found that the State failed to meet its burden under § 54.02(j)(4)(A) when the record contained investigative delays that were far shorter than fourteen months. *In re A.M.*, 577 S.W.3d 653, 669–72 (Tex. App.—Houston 2019, pet. denied) (delays totaling seven months). But this was not the only delay that was within the State's control.

### III. The State's Motion to Continue the October 21 Trial Setting was Based on Three Grounds that were All Within the State's Control.

Despite the above delay—and every other delay cited by the majority—the State still had approximately three months to proceed before J.P.D.D. turned eighteen on November 21, 2024. Indeed, a jury trial was set for October 21, 2024. However, on

9

October 16, 2024, Michael Meyer, the fourth prosecutor assigned to this case[5], filed a motion to continue the trial setting for sixty days. In this motion, the State said that it was "not ready to proceed" for three reasons:

> First, the State and [J.P.D.D.] have been involved for a period of time in negotiations to see if this case can be resolved. Only recently has it become clear that there will be no deal reached on this case.
>
> Second, the State is exercising its right to ask the Grand Jury to approve the petition in this case so that the State may seek a determinate sentence on all felony charges pending against [J.P.D.D.].
>
> Third, the State has not completed its trial preparations in this case. Because of numerous other serious cases[,] the State needs an additional sixty (60) days to prepare this case for trial.

See TEX. R. CIV. P. 21(a) (requiring written motions to "state the grounds therefor").

As to the first reason, Meyer's decision not to prepare for trial because he was optimistic that the parties would reach a plea agreement was a choice purely within his control. Likewise, the State controls when potential charges are presented to a grand jury. See TEX. CODE CRIM. PROC. ANN. art. 20A.103 ("The attorney representing the state is entitled to appear before the grand jury and inform the grand jury of offenses subject to indictment at any time except when the grand jury is discussing the propriety of finding an indictment or is voting on an indictment."). Here, the State amended its petition for adjudication by adding two counts of aggravated assault with a deadly weapon, one count for each of the uninjured occupants in the vehicle, on September 12, 2024. But the record reflects that CCPD obtained statements from these complainants on the day of the

---

[5] Northcutt explained that, "because of the fluctuation of people going in and out of the [district attorney's] office," he was the attorney in charge "on a number of occasions," and therefore had personal knowledge about the prosecution's efforts throughout the timeline of the case.

offense, February 19, 2023. For example, one complainant "stated that she believes approximately three shots hit her truck." Stated differently, the State was aware of these potential charges twenty-one months before J.P.D.D. turned eighteen. Yet, for reasons that are unexplained by the record, the State waited nineteen months to pursue them. *See* TEX. FAM. CODE § 53.012(a) ("The prosecuting attorney shall promptly review the circumstances and allegations of a referral made under [§] 53.01 for legal sufficiency and the desirability of prosecution and may file a petition without regard to whether probable cause was found under [§] 53.01."). In any event, the grand jury approved the State's amended petition on October 17, 2024, four days before the trial setting.

Finally, a prosecutor's heavy caseload is not a sufficient justification for delay under § 54.02(j)(4)(A). *See In re J.J.T.*, 711 S.W.3d at 698 (observing that "the record also reflects delays attributable to the State, such as [the investigating officer's] caseload"); *Moore*, 532 S.W.3d at 402, 405 (concluding that a "detective's heavy caseload" was not a reason beyond the State's control). Although Meyer was present at the waiver hearing, he did not testify, and thus never disavowed his prior representation to the juvenile court that "numerous other serious cases" prevented the State from "complet[ing] its trial preparations in this case." True, the State's chief appellate attorney, Douglas Norman, argued during closing that murder trials generally "take[] a lot of time to prepare for" because it "takes time to get witnesses there" and "to think out your strategy."[6] The juvenile court was receptive to this idea, opining that "it's very difficult to try a murder case."

---

[6] The majority quotes this language without identifying the speaker or clarifying that it was not testimony.

11

But unlike Northcutt, Norman was never sworn in, and the circumstances suggest that Norman was making a general observation, rather than tendering evidence on the record based on his personal knowledge about this case, which he only became involved in after J.P.D.D. turned eighteen. *See Estate of Brown*, 704 S.W.3d 428, 435 (Tex. 2024) ("When, during an evidentiary hearing, counsel makes unsworn factual statements as an officer of the court, on the record and without objection from opposing counsel, such statements are properly considered as evidence."); *Vaccaro v. Raymond James & Assocs., Inc.*, 655 S.W.3d 485, 491–92 (Tex. App.—Fort Worth 2022, no pet.) (explaining that an attorney's statements are not evidence unless "the circumstances clearly indicate that the attorney is tendering evidence on the record based on personal knowledge and the opposing party fails to object" (citations omitted)). His argument is also inconsistent with Northcutt's testimony that, aside from determining which juvenile allegedly fired the fatal shot, the State's theory of the case coalesced within a week of the offense, providing the prosecution with ample runway to work out the finer details of its trial strategy. Most importantly, the argument is built on the false premise that for reasons beyond the State's control, the prosecution only had two months to prepare for the October trial setting and three months to proceed before J.P.D.D. turned eighteen.

Northcutt was the only witness who actually testified about the State's motivation for requesting the October 16 continuance, and he confirmed that the State "needed more time to prepare this case for trial," but offered an entirely different reason. According to Northcutt, the State was not ready to proceed on October 21 in part because his "daughter was getting married," which prevented him from assisting Meyer in preparing for trial. This

12

unflattering admission was not the State's last.

**IV.    The State Intended to Adjudicate J.P.D.D. as a Juvenile but Lost Track of His Birthday.**

The State initially filed a petition to transfer J.P.D.D. to district court for criminal proceedings based on "the seriousness of [the alleged] offenses." *See* TEX. FAM. CODE § 54.02(a). Before taking up the motion, the juvenile court referred J.P.D.D. for a psychological evaluation. *See id.* 54.02(d) ("Prior to the hearing, the juvenile court shall order and obtain a complete diagnostic study, social evaluation, and full investigation of the child, his circumstances, and the circumstances of the alleged offense."). Among other findings, the evaluator reported that J.P.D.D.'s Full-Scale IQ is 74, which places him in the "borderline range," and that his "level of cognitive sophistication and maturity is below that of age-equivalent peers." The evaluator ultimately opined that "procedures, services, and facilities currently available to the juvenile court could provide adequate protection to the public and the likelihood of rehabilitation." The State apparently agreed. After the evaluation, the State filed its original petition for adjudication.

It is undisputed that the State intended to adjudicate J.P.D.D. as a juvenile and only filed its "Emergency Petition for Transfer to Adult Criminal Court" after realizing that it had inadvertently failed to proceed before J.P.D.D.'s eighteenth birthday:

| [The State]: | And just to come clean, did you notice that his 18th birthday was going to pass [when the State requested a sixty-day continuance on October 16, 2024]? |
|---|---|
| [Northcutt]: | I did not at the time because my own caseload, I was not—not focusing on this. Everything is divided by alphabet so he's not in my alphabet. I did not notice until later and then started this |

13

|  |  |
|---|---|
| | procedure at the urging of the district attorney. |
| | . . . . |
| [J.P.D.D.'s Counsel]: | Right. And that would have been an option to proceed with adjudication, right? Determinate sentence adjudication? |
| [Northcutt]: | That was our intent. |

Neither Meyer, who filed the motion, nor Northcutt, who apparently stood in for Meyer at the continuance hearing, noticed the implications of continuing the case for sixty days. Perhaps this mistake was due to "the fluctuation of people going in and out of the [district attorney's] office." Whatever the reason, this error regarding J.P.D.D.'s age is charged against the State.[7] *See Moore*, 532, S.W.3d at 402, 405.

## V.      Conclusion

The juvenile court observed that this case posed "a harsh result either way. It's a dismissal or a certification, both of which have serious ramifications for a lot of individuals involved." While undoubtedly true, the narrow question before the juvenile court was whether the State met its burden to prove by a preponderance of the evidence that, for reasons beyond the State's control, it was infeasible for the State to adjudicate J.P.D.D. before he turned eighteen. When lining up the facts in this case, including those cited by

---

[7] The majority deems it significant that J.P.D.D.'s trial counsel agreed to the continuance. J.P.D.D.'s appellate counsel suggested to the juvenile court that trial counsel may have agreed to the motion for strategic reasons. He compared it to defense counsel staying mum when the statute of limitations is about to run. We don't know if trial counsel's agreement was intentional or inadvertent because he did not testify. In any event, it was the State's motion, and J.P.D.D.'s counsel merely acquiesced at the continuance hearing. Moreover, upon questioning from the juvenile court, the State correctly conceded that J.P.D.D. did not waive the juvenile court's jurisdiction by failing to object. *See Guardianship of Fairley*, 604 S.W.3d 450, 454 (Tex. App.—San Antonio 2020), *aff'd*, 650 S.W.3d 372 (Tex. 2022) (explaining that subject-matter jurisdiction "may not be waived by the parties" (quoting *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993))).

the majority, I cannot escape the conclusion that the juvenile court's finding conflicts with the great weight and preponderance of the evidence so as to be clearly wrong or unjust, especially considering the State's misrepresentations about the alleged delays with forensic testing.[8] For that reason, I respectfully dissent.

JENNY CRON
Justice

Delivered and filed on the
15th day of January, 2026.

---

[8] When an appellant raises a factual sufficiency challenge, we are required to "consider and weigh all of the evidence" in the record. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (concluding "the court of appeals did not conduct a proper factual-sufficiency review" because it failed to consider the entire record). J.P.D.D. challenged the factual sufficiency of the evidence supporting the trial court's finding that, for reasons beyond the State's control, it was not practicable for the State to proceed in juvenile court before he turned eighteen. In discussing this issue, he specifically challenged the State's assertion that alleged delays caused by DPS crime laboratories were beyond the State's control. Therefore, contrary to the majority's suggestion, we are required to examine "all of the evidence" that supported or contradicted the State's position, including the fourteen-month delay between the collection and submission of the evidence. *See id.*